**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE:  PATRICK LEE OLSON, | : | CHAPTER 7 |
| | : | |
| Debtor. | : | No. 22-11556-mdc |
| | : | |
| | : | |
| MICHAEL WILEY, successor by assignment to MCGRATH TECHNICAL STAFFING, INC. d/b/a MCGRATH SYSTEMS, | : : : | |
| | : | |
| Plaintiff, | : | ADVERSARY PRO NO. 22-00058 |
| v. | : | |
| | : | |
| PATRICK LEE OLSON, | : | |
| Defendant. | : | |
| | : | |

# <u>MEMORANDUM</u>

## I.     INTRODUCTION

Pending before the Court for resolution are (i) the Complaint[1] filed by creditor Michael

Wiley ("Mr. Wiley") in the above-captioned adversary proceeding (the "Nondischargeability

Action"), seeking a determination that the judgment he holds against Patrick Olson (the "Debtor"

and together with Mr. Wiley, the "Parties") in the amount of $3,678,122.58 (the "Default

Judgment") is nondischargeable pursuant to §§523(a)(2) and (a)(4) of the United States

Bankruptcy Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), and (ii) the Debtor's

motion to avoid Mr. Wiley's judicial lien on the Debtor's real property located at 101 Blossom

---

1 Adv. Pro. Docket No. 1.

Way, Pottstown, Pennsylvania (the "Property") as a result of the Default Judgment (the "Lien

Avoidance Motion") to the extent it impairs the Debtor's homestead exemption.[2]

The Court held an evidentiary trial (the "Trial") in the Nondischargeability Action on

August 8, 2022, at the conclusion of which it took the matter under advisement.  The Court held

a hearing (the "Hearing") on the Lien Avoidance Motion on November 14, 2023, at the

conclusion of which the Court took that matter under advisement as well.

For the reasons discussed below, the Court finds that (i) $3,003,000.00 of the Default

Judgment is excepted from the Debtor's discharge pursuant to §523(a)(2)(A) of the Bankruptcy

Code, and (ii) Mr. Wiley's judicial lien on the Property is avoided for all amounts in excess of

$115,864.95.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.     The Parties' Business Relationship and the 2017 Deals

Mr. Wiley owned and operated a general staffing business through his entity, McGrath

Technical Staffing d/b/a McGrath Systems ("McGrath").  The Debtor owned and operated an

entity called Idea IT Solutions, LLC ("Idea Solutions").  Mr. Wiley was introduced to the Debtor

in or about 2016, and at some point thereafter, the Parties commenced a business relationship

involving the procurement and supply of technology hardware and software to third parties

(collectively, the "Technology Products").  Pursuant to that relationship, Mr. Wiley, through

---

2 Bankr. Docket No. 50.

3 The factual background set forth herein is taken from the undisputed portions of the Parties' pleadings
in this case, including their Joint Pre-Trial Statement filed at Bankr. Docket No. 32, and the evidence
presented at Trial in the form of the Parties' testimony and admitted exhibits.  In an effort to enhance
readability, citations to the Trial testimony are omitted.

McGrath, would obtain and contribute capital funding, which the Debtor would then use to acquire, configure if necessary, and supply the Technology Products to clients.

Three deals that occurred or were contemplated in 2017 are relevant to the Nondischargeability Action (collectively, the "2017 Deals"). First, according to the Debtor, he and Mr. Wiley had a deal with an entity referred to as CMG (the "CMG Deal"), whereby CMG paid McGrath funds for the purchase of certain software, which McGrath then paid to Idea Solutions,[4] minus a small percentage that McGrath kept. The Debtor, through Idea Solutions, then provided CMG with the software. In connection with the CMG Deal, McGrath made the following payments to Idea Solutions:

| Date | Amount |
|------|--------|
| February 7, 2017 | $24,370.87 |
| March 23, 2017 | $283,600.00 |
| April 10, 2017 | $270,400.00 |
| May 23, 2017 | $120,000.00 |
| June 2, 2017 | $30,000.00 |
| July 18, 2017 | $54,000.00 |
| **Total** | **$782,370.87** |

See Plaintiff's Ex. 1. For reasons that are not clear to the Court after reviewing the testimony of both the Debtor and Mr. Wiley, McGrath treated the last of these two payments, totaling $84,000, as being outstanding debts owed to it (the "Outstanding CMG Payments").

The second of the 2017 Deals was a proposed project with an entity referred to as Synechron, pursuant to which it was contemplated that Idea Solutions would acquire certain

---

4 Mr. Wiley stated during his testimony that he paid the funds to the Debtor, but Plaintiff's Exhibit 1, which Mr. Wiley testified was an internal McGrath document, reflects that payments were made to "IDEA IT". The Court understands that entity to refer to Idea Solutions, the Debtor's company, and therefore interprets Mr. Wiley's testimony to be that he gave the funds to Idea Solutions.

technology equipment for Synechron (the "Synechron Deal").  In connection with the Synechron

Deal, McGrath made the following payments to Idea Solutions:

| Date | Amount |
|------|--------|
| February 15, 2017 | $150,000.00 |
| March 8, 2017 | $250,000.00 |
| April 25, 2017 | $200,000.00 |
| **Total** | **$600,000.00** |

Although Idea Solutions evidently acquired the technology as contemplated, the Synechron Deal

did not close for reasons that were not explained at Trial.  As a result, McGrath was not repaid

any amount of the moneys paid to Idea Solutions, and treated all of the payments, totaling

$600,000, as outstanding (the "Outstanding Synechron Payments").[5]

The last, and most relevant here, of the 2017 Deals was one the Debtor represented to Mr.

Wiley to be with an entity referred to as CSS (the "CSS Deal").  The Debtor approached Mr.

Wiley about a deal with CSS, again for the provision of equipment by Idea Solutions.  Mr. Wiley

testified that, at the Debtor's suggestion, the CSS Deal would be fulfilled in part with new

equipment to be procured, and in part with equipment from the Synechron Deal that did not

close, which was being stored in Virginia.  According to Mr. Wiley, because the CSS Deal was

larger in scale and scope than the Parties' prior deals, he and the Debtor established a new

company, Idea IT Services, LLC ("Idea Services"), with the Debtor to serve as the President and

Managing Member and Mr. Wiley to serve as a "co-member".

---

[5] The Debtor could not recall at Trial what specific equipment or technology hardware was purchased in connection with the Synechron Deal, nor could he recall the specifics of the ultimate disposition of that equipment, but asserted that all equipment was long ago sold and that he made a large cash payment of approximately $200,000 to Mr. Wiley in connection with that sale.  No further evidence of any such payment was presented to the Court, and the Court finds that the Debtor's lack of recollection regarding the alleged disposition and payment undermines any value the testimony might have otherwise had.

In connection with the CSS Deal, McGrath obtained capital funding and made the following payments to Idea Solutions:[6]

| Date | Amount |
|------|--------|
| June 9, 2017 | $310,000.00 |
| August 7, 2017 | $105,000.00 |
| September 29, 2017 | $75,000.00 |
| **Total** | **$490,000.00** |

Furthermore, although no documentary evidence was provided at Trial, Mr. Wiley testified that an additional $87,000.00 was wired to Idea Solutions after September 29, 2017, resulting in total new capital payments of $577,000.00 that McGrath made to Idea Solutions in connection with the CSS Deal (the "Outstanding CSS Payments"). The payments were funded by a line of credit McGrath held with its lender, Centric Bank ("Centric"). Mr. Wiley testified that the anticipated profit from the CSS Deal after repayment of the capital provided was approximately $2.3 million.

Collectively, Mr. Wiley asserts that when the Outstanding CMG Payments, the Outstanding Synechron Payments, and the Outstanding CSS Payments are totaled, the outstanding amount McGrath funded for the 2017 Deals was $1,261,000 (the "2017 Deals Outstanding Payments").[7]

---

6 There was no testimony or other evidence at Trial as to why funds were sent to Idea Solutions rather than the newly-formed Idea Services.

7 Plaintiff's Exhibit 1 reflects outstanding payments of $1,174,000 for the 2017 Deals, but as noted *supra,* Mr. Wiley testified that there was an additional $87,000 in payments post-dating September 29, 2017 that

### B.      The Purported CSS Contract and the Promissory Note

In or about September 2017, Centric informed the Parties that further draws for the CSS

Deal would be dependent on collateralizing the funding.[8]  Centric therefore required a signed

contract for the CSS Deal that would be assigned to the bank as security.  According to Mr.

Wiley, within one week of being so informed, the Debtor provided a signed contract with CSS to

Mr. Wiley (the "CSS Contract"), purportedly executed by the Debtor as President of Idea

Services and by Adam Newman ("Mr. Newman") as Chief Operating Officer of CSS.[9]  Mr.

Wiley testified that he then provided the CSS Contract to Centric, after which funds were

released for the CSS Deal.[10]

Mr. Wiley testified that the CSS Deal was to close by mid-December 2017, but he was

repeatedly advised by the Debtor, beginning in December 2017 and continuing through March

2018, that there were multiple alleged issues which were preventing closing by that date.  As a

result, Mr. Wiley required, and the Parties agreed to Idea Solutions' issuance of a Promissory

---

are not reflected in the exhibit.

[8] Although the Debtor acknowledged being present for one or more meetings with Centric, he did not recall whether he was at the meeting during which Centric required the collateralization of the line of credit.

[9] *See* Plaintiff's Exhibit 2.  The signature page of the CSS Contract admitted into evidence reflects an execution date of November 9, 2017.  The cover page, however, reflects a "prepared date" of September 10, 2017.  Mr. Wiley explained that the differing dates are the product of amendments that were made after the contract was initially given to him for presentment to Centric.  This is supported by Plaintiff's Exhibit 2, which includes not only the amended CSS Contract dated in November 2017, but also the original CSS Contract, providing for different payment terms, which was purported to be executed on September 14, 2017.  The Court is puzzled why this was not clarified by Mr. Wiley's counsel during Mr. Wiley's testimony, rather than by the Court only upon examination of the entirety of Plaintiff's Exhibit 2.

[10] The Debtor testified that prior to McGrath making the Outstanding CSS Payments, he would have told Mr. Wiley that additional capital was needed to purchase equipment to be able to do the CSS Deal, and admitted that he "represented" to Mr. Wiley that he had the CSS Deal, though he did not admit to advising Mr. Wiley that there was a contract until the forged document was presented in September 2017.

6

Note to McGrath, dated April 2, 2018 (the "Note"), in the principal amount of $1,261,000.00

(the "Principal Amount").[11]  Mr. Wiley testified that the Parties agreed the Principal Amount

reflected the amount that was to be used to fulfill the CSS Deal through that date, consisting of

$600,000 in equipment purchased for the failed Synechron Deal that was to be repurposed for the

CSS Deal, in addition to the $577,000 in additional capital funded for the CSS Project.[12]  The

Note also provides for a "Premium Payment" of $2,426,000, which Mr. Wiley testified was

intended to capture the profit McGrath expected to receive from the CSS Deal.  Together, the

Principal Amount and the Premium Payment total $3,687,000, although the Note provides that

"the aggregate amount of the Principal Amount and the Premium Payment to be paid by [Idea

Solutions] to [McGrath] here under shall be $3,600,000."[13]  Pursuant to the terms of the Note,

Idea Solutions was to make monthly installment payments of $40,000 (the "Installment

Payments") commencing on June 19, 2018, together with "all project-based revenue."  The

Debtor executed the Note on behalf of Idea Solutions and guaranteed its obligations thereunder.

Idea Solutions only made one Installment Payment thereafter.  McGrath filed suit against

the Debtor in Pennsylvania state court,[14] resulting in the entry of the Default Judgment against

---

11 *See* Plaintiff's Exhibit 3.

12 Mr. Wiley actually testified that the Note reflected the $600,000 funded for the Synechron equipment
as well as $490,000 funded for the CSS Deal, thereby failing to account for the additional $87,000 he said
was funded for the CSS Deal after September 29, 2017.  Furthermore, Mr. Wiley's testimony lacked
precision and clarity on this point because, even if the additional $87,000 is included, these figures total
only $1,177,000, not the Principal Amount under the Note of $1,261,000.  The $84,000 difference is
clearly attributable to the Outstanding CMG Payments on McGrath's books.  Notwithstanding Mr.
Wiley's imprecise testimony, the Court is able to determine from the documentary evidence that the
Principal Amount consists of all the 2017 Deals Outstanding Payments.

13 *See* Note, at ¶2.  No explanation was provided at Trial for this discrepancy.

14 McGrath's claim against the Debtor was based on his guarantee of Idea Solutions' obligations under
the Note, but apparently McGrath did not also sue Idea Solutions.  No testimony or explanation was given

the Debtor in November 2018 in the amount of $3,678,122.58, which Mr. Wiley testified

represented both the amount outlaid for the CSS Deal and the Premium Payment.[15]

McGrath subsequently took discovery from the Debtor's bank, BB&T, in aid of

execution on the Default Judgment.  Through that discovery, Mr. Wiley learned that the Debtor

had forged the CSS Contract and had used the Outstanding CSS Payments for personal expenses,

including payments for vacations and gambling debts.  Mr. Wiley testified that he then contacted

Centric and the Whitpain Township police department, which after investigation, arrested and

charged the Debtor with criminal forgery in August 2019.  The Debtor was subsequently

convicted in February 2022 in Pennsylvania state court, and among the criminal penalties

imposed was a restitution judgment (the "Restitution Judgment"), entered on March 1, 2022, in

the amount of $1,042,258.87.[16]  Mr. Wiley testified that payments under the Restitution

Judgment were supposed to be in the amount of $12,000 per month, but he had received only a

"couple hundred dollars" in total.[17]

For his part, the Debtor testified that the CSS Deal was not entirely fabricated.  The

Debtor had approached CSS about a project, but because CSS was a government-sponsored

agency, a lengthy approval process was required to become a vendor of CSS.  The Debtor

---

for this at Trial.

[15] *See* Plaintiff's Exhibit 6.  The Default Judgment is broken down as follows: (i) $3,656,327.42 for the
amount claimed in the complaint, (ii) $11,572.91 for interest, and (iii) $10,222.25 for miscellaneous fees
and costs.  The Debtor asserted during his testimony that he did not defend the suit because he was not
notified or served.

[16] *See* Plaintiff's Exhibit 5.  Mr. Wiley acknowledged that he does not have the right to enforce the
Restitution Judgment, which was entered in favor of the Clerk of the Pennsylvania state court, and did not
know how the amount of the Restitution Judgment was calculated.  The Debtor, for his part,
acknowledged that the Restitution Judgment is nondischargeable.

[17] The Court is not clear of the basis on which Mr. Wiley asserted that the Restitution Judgment

testified that he forged the CSS Contract because he "needed to get [the CSS Deal] moving, and [he] wanted to keep it moving while [he] was trying to do other things."  The Debtor further testified that "most" of the money McGrath funded for the CSS Deal came before the forged CSS Contract in September 2017.  With respect to how the Outstanding CSS Payments were deployed, the Debtor acknowledged that "some of the monies went toward gambling" in 2017 and some portion also likely went to pay personal expenses.

On November 3, 2021, Mr. Wiley filed a praecipe in the Pennsylvania state court requesting the assignment of the Default Judgment from McGrath to Mr. Wiley.

### C.       McGrath and Mr. Wiley File Their Own Bankruptcies

Mr. Wiley testified that the financial losses caused by the 2017 Deals with the Debtor caused McGrath to enter a "death spiral" that ultimately led it to file for chapter 11 bankruptcy in August 2020.  That case was subsequently voluntarily dismissed in early 2021.  It also caused Mr. Wiley and his wife to file a chapter 7 bankruptcy petition in August 2020.  In McGrath's bankruptcy case, its proposed plan identified assets of approximately $11,000, and liabilities of approximately $5.9 million.[18]  Mr. Wiley testified that, based on this balance sheet, in his personal bankruptcy he listed the value of his 100% ownership in McGrath as $1.00 in Schedule A/B, although he believed the true value was negative.  Mr. Wiley also exempted his interest in McGrath in his amended Schedule C.  Mr. Wiley and his wife received a discharge in their bankruptcy case on November 19, 2020.

---

payments were to be $12,000 monthly, as nothing on the face of the judgment so provides.

[18] *See* Plaintiff's Exhibit 8.

As noted *supra*, Mr. Wiley had McGrath assign the Default Judgment to himself in
November 2021, and he thereafter commenced execution on the judgment.  Mr. Wiley testified
that Centric, which McGrath owed approximately $5.9 million, had already deemed the Default
Judgment uncollectible.

## III.   DISCUSSION

### A.   Applicable Legal Standard for Nondischargeability Action

A goal of the bankruptcy process is to provide debtors with a fresh start, and exceptions
to discharge are construed strictly against the creditor and liberally in favor of the debtor.  *Linder*
*v. Berry (In re Berry)*, 2012 Bankr. LEXIS 4668, at *8 (Bankr. W.D. Pa. Oct. 2, 2012) (citing
*Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113 (3d Cir. 1995)).  A plaintiff must
prove the elements of a nondischargeability claim by a preponderance of the evidence.  *Berry*,
2012 Bankr. LEXIS 4668, at *9 (*citing Grogan v. Garner*, 498 U.S. 279, 285 (1991)).

#### 1.   The §523(a)(2) Claim

Section 523(a)(2)(A) of the Bankruptcy Code excludes from discharge any debt obtained
by "false pretenses, a false representation, or actual fraud, other than a statement respecting the
debtor's or an insider's financial condition."  11 U.S.C. §523(a)(2)(A).  Count I of the Complaint
asserts that the Debtor "stole over $1.2 million from Mr. Wiley via a fraudulent and illegal
scheme involving forgery, outright lies, and false representations, intending Mr. Wiley to rely on
said misrepresentations to his detriment."

In order for a plaintiff to prevail under the false representation provision of
§523(a)(2)(A), it must demonstrate that (1) the debtor made representations knowing they were
false; (2) the debtor made the representations with the intent and purpose of deceiving the

plaintiff; (3) the creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss or damage as a proximate consequence of the representation having been made. *Monarch Capital Corp. v. Bath (In re Bath)*, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010)).

The elements of establishing a claim for false pretenses are similar, but there is a distinction between a debt incurred by a false representation and one incurred by false pretenses: "the 'false representation' ground requires a showing that the debtor made a 'false or misleading statement about something.' The second option, 'false pretense,' requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction by the plaintiff." *Id.* at 387 (*quoting In re Giquinto*, 388 B.R. 152, 165 n.26 (Bankr. E.D. Pa. 2008)). As such, a plaintiff alleging a debt was incurred by false pretenses must prove that: (1) there was an omission or implied misrepresentation; (2) promoted knowingly and willingly by the debtor; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; and (4) which wrongfully induced the plaintiff to advance money, property or credit to the debtor. *Id.* Whether asserting a false representation or false pretenses, a showing of fraudulent intent is required, and the court must look at the debtor's intention at the time the debt arose. *LL Lifestyle, Inc. v. Vidal (In re Vidal)*, 2012 Bankr. LEXIS 4198, at *47-48 (Bankr. E.D. Pa. Sept. 6, 2012).

A claim of actual fraud under §523(a)(2)(A) requires that the plaintiff prove: (1) the debtor obtained money, property or services through a material misrepresentation; (2) the debtor, at the time of the transaction, had knowledge of the falsity of the misrepresentation or reckless disregard or gross recklessness as to its truth; (3) the debtor made the representation with intent to deceive; (4) the plaintiff reasonably relied on the representation; and (5) the plaintiff suffered

loss, which was proximately caused by the debtor's conduct.  *Lewandowski v. Moeller (In re Moeller)*, 2014 Bankr. LEXIS 1236, at *19 (Bankr. D.N.J. Mar. 31, 2014); *see also In re Ritter*, 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009) (listing the same elements needing to be proved in order for a debt to be declared non-dischargeable under §523(a)(2)(A)).

As the above indicates, two principles apply generally to claims under §523(a)(2)(A). First, an affirmative misrepresentation from the debtor is not required for a debt to be deemed nondischargeable under §523(a)(2)(A).  Rather, silence, omissions or a failure to disclose material facts on which a transaction depends can bring a debt under the statute.  *See Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 216 (3d Cir. 1997) (a finding of "actual fraud" under section 523(a)(2)(A) may be predicated on a failure to disclose a material fact); *Lewandowski v. Moeller (In re Moeller)*, 2014 Bankr. LEXIS 1236, at *19 (Bankr. D.N.J. Mar. 31, 2014) ("The first element of fraud pursuant to Section 523(a)(2)(A) requires a material misrepresentation that includes words (written or oral), conduct, or omissions.  This representation can come in the form of silence.") (internal citations omitted).  Second, a plaintiff can prove a debtor had an intent to deceive by establishing that the debtor acted with gross recklessness as to the truth. *U.S. Sec. & Exch. Comm. v. Bocchino (In re Bocchino)*, 794 F.3d 376, 382 (3d Cir. 2015).

### 2.     The §523(a)(4) Claim

Section 523(a)(4) excludes from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. §523(a)(4).  Section 523(a)(4) effectively presents three distinct causes of action: (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; or (3) larceny.  *Sibbet v. Presutti (In re Presutti)*, 540 B.R. 154, 169 (Bankr. W.D. Pa. 2015).  To establish grounds for nondischargeability based on fraud

or defalcation, a plaintiff must prove that the debtor acted as a fiduciary, while proof of a

fiduciary relationship is not required for claims alleging embezzlement or larceny.  *LL Lifestyle,*

*Inc. v. Vidal (In re Vidal)*, 2012 Bankr. LEXIS 4198, at \*59 (Bankr. E.D. Pa. Sept. 6, 2012).

      Count II of the Complaint asserts that, as Mr. Wiley's business partner, the Debtor owed

Mr. Wiley a fiduciary duty, but violated this duty by "stealing the monies and lying even about

the existence of the [CSS Deal]" and by "forging the various documents related to the alleged

[CSS Deal]."  Count II also asserts that that the Debtor engaged in both larceny and

embezzlement "as the Debtor has misappropriated over $1.2 million from [Mr. Wiley], and the

Debtor has unlawfully taken possession and control of these funds, and then improperly

liquidated these funds by gambling them away, without any authorization."

    **a.**    **Fraud or Defalcation While Acting in a Fiduciary Capacity
Under §523(a)(4)**

      To prevail on a cause of action for fraud or defalcation while acting in a fiduciary

capacity, a plaintiff must establish by a preponderance of evidence that the debtor (1) acted in a

fiduciary capacity, and (2) engaged in fraud or defalcation while acting in such capacity.  *Vidal*,

2012 Bankr. LEXIS 4198, at \*65.  If the plaintiff establishes that the debtor was in a fiduciary

relationship with it within the narrow scope of §523(a)(4), the plaintiff must also establish that

the debtor committed a fraud or defalcation in that role.  In the context of §523(a)(4), fraud

involves intentional deceit, rather than implied or constructive fraud.  *Vidal*, 2012 Bankr. LEXIS

4198, at \*67 (internal citations omitted).  Defalcation includes any failure to account for funds

that have been entrusted to a fiduciary.  *Id.* ("For purposes of section 523(a)(4), 'defalcation' is

limited to situations where a fiduciary misappropriates or otherwise fails to account for money or

property held in her fiduciary capacity.").  Defalcation requires a culpable state of mind

involving knowledge of, or gross recklessness with respect to, the improper nature of the relevant fiduciary behavior. *Bullock v BankChampaign, N.A.*, 569 U.S. 267, 269, 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013); *Fogg v. Pearl (In re Pearl)*, 502 B.R. 429, 440 (Bankr. E.D. Pa. 2013). *Bullock* has been read to create two scienter levels that may constitute a nondischargeable defalcation: (1) defalcation involving bad faith, moral turpitude, or other immoral conduct (such as self-dealing), and (2) defalcation involving less culpable recklessness, *i.e.*, a conscious disregard of, or a willful blindness to, a substantial and unjustifiable risk. *Pearl*, 502 B.R. at 440.

"Fiduciary capacity" generally has a narrower meaning in bankruptcy than its traditional common law definition. *Vidal*, 2012 Bankr. LEXIS 4198, at *65; *Estate of Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 777 (Bankr. E.D. Pa. 2004). For purposes of §523(a)(4), a fiduciary relationship requires an express or technical trust; implied and constructive trusts imposed as a matter of law after the fact, due to the conduct of the parties, does not create a fiduciary relationship. *Vidal*, 2012 Bankr. LEXIS 4198, at *66; *Dawley*, 312 B.R. at 777. To wit, a trust imposed as a result of the wrongful act out of which the debt arose does not fulfill the fiduciary capacity requirement - the debtor must have been a trustee before the wrong occurred and without reference to it. *Dawley*, 312 B.R. at 777. An express trust, created with the settlor's express intent, requires that there be (1) a trust *res*, (2) a beneficiary, and (3) a trustee obligated to administer the *res* for the benefit of the beneficiary. *Bayer*, 521 B.R. at 507. A technical trust, created by statute or common law, must (1) define the trust *res*, (2) spell out the trustee's fiduciary duties to a beneficiary, and (3) impose the trust prior to and without reference to the wrong that created the debt. *Id.* The parties must also manifest their intention to create a trust. *Dawley*, 312 B.R. at 777.

14

Whether a debtor was acting in a fiduciary capacity is a question of federal law, but state law determines whether the requisite trust relationship exists. *Villas at Bailey Springs Homeowners Ass'n v. Laricci*, 2011 U.S. Dist. LEXIS 11231, at *6 (M.D. Pa. Sept. 30, 2011); *Bayer*, at 508 n.32 (while the label state law places on a relationship is not dispositive in the context of §523(a)(4), the bankruptcy court is required to "consult state law before applying the Bankruptcy Code concept of 'fiduciary.' The critical issue is whether the characteristics of the state law duties create a fiduciary relationship under federal law."). The fact that an officer of a Pennsylvania corporation is a fiduciary, however, does not necessarily establish that they were acting in a fiduciary capacity under §523(a)(4), as found by numerous courts in this Circuit. *See Bayer*, 521 B.R. at 512 (following *Dawley* and *In re Johnson*, 242 B.R. 283 (Bankr. E.D. Pa. 1999), in rejecting *per se* rule that corporate officers or directors are fiduciaries under §523(a)(4) in jurisdictions in which their obligations are those of loyalty and good faith); *Laricci*, 2011 U.S. Dist. LEXIS 11231, at *6 (acknowledging a split among courts on the issue but noting that "[t]he majority of recent decisions in the bankruptcy and district courts of this Circuit have held that the general fiduciary duties of corporate officers and directors are insufficient to establish a fiduciary capacity under §523(a)(4).") (internal citations omitted).

### b.    Embezzlement Under §523(a)(4)

Embezzlement pursuant to §523(a)(4) requires proof of: (1) entrustment, (2) of property (3) of another (4) that is misappropriated (used or consumed for a purpose other than for which it was entrusted), (5) with fraudulent intent. *Compton v. Moschell (In re Moschell)*, 2020 Bankr. LEXIS 2829, *11 (Bankr. W.D. Pa. Oct. 9, 2020); *Islinger v. Hillisheim*, 2011 Bankr. LEXIS 1326, at *9 (Bankr. D.N.J. 2011).

15

###### c.      Larceny Under §523(a)(4)

Larceny, for purposes of §523(a)(4), is the fraudulent and wrongful taking and carrying away of the property of another with the intent to convert such property to the taker's use without the consent of the owner.  *Sullivan v. Clayton (In re Clayton)*, 198 B.R. 878, 884 (Bankr. E.D. Pa. 1996) (citing *In re Graham*, 194 B.R. 369, 374 (Bankr. E.D. Pa. 1996)).  Larceny thus requires that the initial appropriation of the property of another be wrongful.  *Id.*

#### B.      Applicable Legal Standard for Lien Avoidance Motion

The Debtor seeks to avoid Mr. Wiley's judgment lien on the Property pursuant to §522(f) of the Bankruptcy Code.  That section provides, in relevant part, that "[T]he debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section if such lien is – (A) a judicial lien ….".  11 U.S.C. §522(f).  Subsection (f)(2)(A) sets forth a formula for determining the extent to which a lien impairs an exemption.  This section provides that a lien "shall be considered to impair an exemption to the extent that the sum of – (i) the lien; (ii) all other liens on the property; and (iii) the amount of the exemption that the debtor could claim if there were no liens on the property; exceeds the value that the debtor's interest in the property would have in the absence of any liens."  11 U.S.C. §522(f)(2)(A).

#### C.      Analysis

##### 1.      Mr. Wiley Is Not Estopped from Pursuing the Nondischargeability Action

As an initial matter, the Court finds that Mr. Wiley is not estopped from pursuing the Nondischargeability Action.  The Debtor argues that Mr. Wiley should be estopped from seeking a finding that the Default Judgment is nondischargeable because he cannot benefit from having

valued his interest in McGrath at $1.00 in his own bankruptcy schedules, only to then assign and pursue the $3.7 million Default Judgment in McGrath's favor after his case was discharged and McGrath's case voluntarily dismissed. In essence, the Debtor argues it is inconsistent for Mr. Wiley to have asserted in his own bankruptcy case that his interest in McGrath held no value, while now seeking to enforce a $3.7 million judgment that McGrath held at the time he did so.

The Court disagrees. Mr. Wiley credibly testified, and McGrath's bankruptcy schedules showed, that on a balance sheet basis, McGrath's assets were *de minimis*, and were stacked against millions of dollars of liabilities. Mr. Wiley also testified that creditors, and specifically Centric, had deemed the Default Judgment uncollectible. The Court therefore finds, in light of the extreme difference in McGrath's assets and liabilities, that Mr. Wiley had legitimate grounds to value his interest in the entity at $1.00 at the time he filed his schedules in his bankruptcy case, and is not estopped from seeking a nondischargeability determination with respect to the Default Judgment. This is the case even if, as he testified, he believes the judgment ultimately is uncollectible. The fact that the Default Judgment may be uncollectible as a practical matter does not preclude Mr. Wiley from asserting that it should not be discharged, and his actions in his own bankruptcy case do not estop him from doing so.

**2.      The Portion of the Default Judgment Attributable to the Outstanding CSS Payments Is Nondischargeable Pursuant to §523(a)(2)(A)**

The Court first addresses whether the Default Judgment is nondischargeable under §523(a)(2)(A). The Court finds that the portion of it attributable to funds McGrath paid in connection with the CSS Deal are nondischargeable.

At the conclusion of Trial, the Debtor conceded he had made a fraudulent misrepresentation and/or committed fraud by providing the forged CSS Contract to Mr. Wiley.

17

There can be no question that he knew of the "falsity" of his representation that a signed CSS

Contract existed, and he made that representation with the intent of deceiving Mr. Wiley in order

to have him provide the contract to Centric to keep open the flow of funds under the Centric line

of credit.  Moreover, Mr. Wiley's reliance on the Debtor's representation that a signed CSS

Contract existed was justifiable and reasonable; the Parties had been doing business together for

some time, Mr. Wiley testified that he had been mostly satisfied with the deals he had done with

the Debtor, and Mr. Wiley had no reason to believe the Debtor would commit criminal forgery in

connection with a deal.

With all of the other elements of both false representation and fraud under §523(a)(2)(A)

established, the question is to what extent McGrath, and therefore Mr. Wiley, suffered a loss as a

result.  The evidence established that the CSS Contract was provided to Mr. Wiley in mid-

September 2017.  According to Plaintiff's Exhibit 1 and Mr. Wiley's testimony, McGrath

thereafter made payments to Idea Solutions totaling $162,000 attributable to the CSS Deal

($75,000 on September 29, 2017 and $87,000 at some point thereafter).[19]  The Debtor did not

contest that these payments were made or that they post-dated his provision of the forged CSS

Contract.[20]  As such, the Court finds that, due to the Debtor's false and fraudulent representation

of the forged CSS Contract, McGrath paid Idea Solutions an additional $162,000.  That portion

of the Default Judgment is therefore nondischargeable pursuant to §523(a)(2)(A).

---

19 Mr. Wiley's testimony that Centric provided the funds for the CSS Deal *after* receiving the signed
CSS Contract in mid-September 2017 is inconsistent with the dates of some of the Outstanding CSS
Payments set forth in Plaintiff's Exhibit 1.  The Court finds that some of the Outstanding CSS Payments
pre-dated the forged CSS Contract.

20 On cross-examination, the Debtor acknowledged that he agreed to the Principal Sum under the Note,
which as discussed *supra,* included the $87,000 Mr. Wiley testified was paid after September 29, 2017.

The Debtor argues that the inquiry ends there, because McGrath could not have relied on the forged CSS Contract prior to it having been provided in mid-September 2017, and therefore any payments made to Idea Solutions before then are not damages attributable to his false and fraudulent representation. The Court, however, finds that even prior to the Debtor's provision of the forged CSS Contract, he obtained payments for the CSS Deal from McGrath under false pretenses. As discussed *supra,* false pretenses under §523(a)(2)(A) requires an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of a transaction. The evidence established that the Debtor approached Mr. Wiley about the CSS Deal, including a proposal that it be structured in part with the unused Synechron equipment and in part with new capital from McGrath. Pressed on cross-examination as to whether, when asking Mr. Riley for additional capital for the CSS Deal, the Debtor implied the deal was already in hand, the Debtor stated that he would not have specifically said there was a contract, but stipulated that he was representing at that time that a deal existed.

The Court finds that in doing so, the Debtor was implicitly representing to Mr. Wiley that he had reached an agreement with CSS for which the funds from McGrath would be used, or alternatively, omitted to make clear that he had yet to do so. This is particularly true because the Debtor's own testimony was that when he approached CSS about a potential deal, he was advised that a lengthy vendor approval process was required given CSS's status as a government-sponsored agency; by inducing McGrath to contribute capital for the CSS Deal without advising Mr. Wiley of this major hurdle, the Debtor knowingly and willingly omitted material information and promoted a misleading understanding in Mr. Wiley's mind as to where things stood with the CSS Deal when he agreed to fund it. As such, rather than only the

19

payments that post-date the Debtor's forgery of the CSS Contract, the Court finds that all amounts in the Default Judgment constituting payments McGrath made to fund the CSS Deal from the time the Debtor approached Mr. Wiley about it are nondischargeable. Per Mr. Wiley's testimony and Plaintiff's Exhibit 1, that includes the payments of $310,000 on June 2, 2017 and $105,000 on August 7, 2017. When these payments are added to the $162,000 in post-forgery payments, discussed *supra*, the total payments excepted from discharge under §523(a)(2)(A) related to the CSS Deal are $577,000.

The Court rejects, however, Mr. Wiley's argument that the remaining amounts of the Default Judgment are likewise nondischargeable as the product of false representations, false pretenses, or fraud. After removing the $577,000 in payments McGrath made for the direct purpose of funding the fraudulent CSS Deal, the balance of the Principal Sum of $1,261,0000, on which the Default Judgment is based, consists of $600,000 in Outstanding Synechron Payments and $84,000 in Outstanding CMG Payments. While Mr. Wiley has painted the Principal Sum as the amount the Parties agreed was attributable to the CSS Deal, the Court finds that, for purposes of §523(a)(2)'s requirements, the Outstanding Synechron Payments and the Outstanding CMG Payments were unconnected to the fraudulent CSS Deal. There was no evidence that any of those payments were made in reliance on, or had any connection at all, to the CSS Deal, prior to them being included in the Principal Sum. Although a component of the purported CSS Deal as proposed by the Debtor was employing the unused Synechron equipment, McGrath's funding of the acquisition of that equipment had already occurred. The evidence supports the conclusion that Mr. Wiley understood the Outstanding Synechron Payments to be for the Synechron Deal, and the Outstanding CMG Payments to be for the CMG Deal. The fact that they were later

20

wrapped into the Principal Sum under the Note, which itself was the product of the delay in

closing the fraudulent CSS Deal, did not convert them to payments made in connection with CSS

Deal.  As such, the Debtor's false representations, false pretenses, and fraud does not extend to

those payments, and they are not nondischargeable under §523(a)(2)(A).

###### 3.   The Portion of the Default Judgment that is Attributable to the Premium Payment is Nondischargeable Pursuant to §523(a)(2)(A)

Mr. Wiley also seeks a determination that the Premium Payment called for under the

Note and awarded by the Default Judgment, representing the alleged anticipated profit from the

CSS Deal, is nondischargeable.  The Debtor, on the other hand, argues that only McGrath's "out

of pocket" payments in connection with the fraudulent CSS Deal are nondischargeable.

The Court finds this issue is controlled by the Supreme Court's decision in *Cohen v. De

La Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed. 2d 341 (1998).  There the Court affirmed a

Third Circuit decision holding that punitive damages, in addition to compensatory damages,

awarded as part of a judgment finding the debtor liable for fraud were excepted from discharge

pursuant to §523(a)(2)(A).  *Id.* at 217.  In so doing, the Court concluded that, based on the "most

straightforward reading" of §523(a)(2)(A), once it is established that specific money or property

has been obtained by fraud, *any debt* arising therefrom is excepted from discharge.  *Id.* at 218.  In

siding with the Third Circuit, the Supreme Court looked not just to the plain language of

§523(a)(2)(A), but also to parallel provisions of §523(a)(2), the history of the fraud exception to

discharge throughout various iterations of statutory bankruptcy law, and the implications that

would arise from the debtor's interpretation that §523(a)(2)(A) is limited to the value of any

money, property, etc., fraudulently obtained by the debtor.  *Id.* at 219-223.  With respect to those

implications, the Court cited examples of situations where a debtor's fraud results in losses to the

21

defrauded party that far exceed that defrauded party's out of pocket payments to the debtor,[21]
and reasoned that "[the debtor's] gloss on §523(a)(2)(A) would allow the debtor in those
situations to discharge any liability for losses caused by his fraud in excess of the amount he
initially received, leaving the creditor far short of being made whole ... Those sorts of results
would not square with the intent of the fraud exception.  As we have observed previously in
addressing different issues surrounding the scope of that exception, it is 'unlikely that Congress
... would have favored the interest in giving perpetrators of fraud a fresh start over the interest in
protecting victims of fraud.'" *Id.* at 223 (quoting *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct.
654, 659-660, 112 L.Ed. 2d 755 (1991)).

 The *Cohen* court's holding that §523(a)(2)(A)'s exception to discharge extends to any
debt arising from money or property obtained by fraud, although decided in the context of a
dispute about punitive damages included in a judgment, applies with equal force to anticipated
profits from an investment a defrauded party makes with the debtor.  The Circuit-level history of
*Cohen* bears this out.  The Third Circuit, in the decision affirmed by the Supreme Court in
*Cohen,* sided with the Eleventh Circuit's interpretation of the phrase "to the extent obtained by"
in §523(a)(2)(A) to mean that debts caused by fraud are nondischargeable in their entirety.
*Cohen v. De La Cruz (In re Cohen),* 106 F.3d 52, 56 (3d Cir. 1997).  In so doing, it rejected the
interpretation of the Ninth Circuit and other courts holding that the phrase operates to limit the

---

21 The Supreme Court cited the following examples: "For instance, if a debtor fraudulently represents
that he will use a certain grade of shingles to roof a house and is paid accordingly, the cost of repairing
any resulting water damage to the house could far exceed the payment to the debtor to install the shingles.
The United States, as *amicus curiae,* posits another example along these lines, involving 'a debtor who
fraudulently represents to aircraft manufacturers that his steel bolts are aircraft quality [and] obtains sale
of $5,000' for the bolts, but 'the fraud causes a multi-million dollar airplane to crash." *Id.* at 222 (internal
citation omitted).

exception's scope strictly to compensatory damages.  Among the decisions the Third Circuit

cited and disfavored as being in line with the Ninth Circuit was *In re Auricchio,* 196 B.R. 279

(Bankr. D.N.J. 1996), where the court took an out-of-pocket approach to what was

nondischargeable under §523(a)(2)(A) to find that anticipated profits could not be included in the

nondischargeable amount.  As such, the Third Circuit rejected an interpretation of §523(a)(2)(A)

that holds anticipated profits may also be nondischargeable, and the Supreme Court affirmed the

Third Circuit's reasoning underpinning that rejection.

Mr. Wiley testified, and the Debtor did not dispute, that the Premium Payment provided

for in the Note was the anticipated profit McGrath was to realize from the fraudulent CSS Deal.

The Debtor's agreement to the Premium Payment in the Note, which then became a part of the

Default Judgment, was an acknowledgement that McGrath expected and was owed its

anticipated profit in connection with the CSS Deal.  While that profit clearly does not consist of

out-of-pocket payments McGrath made, it is a debt of the Debtor that arises from the money the

Debtor obtained from McGrath by fraud.  Mr. Wiley testified that had he known the CSS Deal

was fictitious, he never would have caused McGrath to make the Outstanding CSS Payments to

Idea Solutions, and he never would have calculated or booked anticipated profits from the deal.

It therefore is a debt respecting money that the Debtor has fraudulently obtained, and is

nondischargeable.  *Id.*

The amount of the Premium Payment far exceeds McGrath's payments with respect to

the CSS Deal.  The Debtor's argument, however, that such an enormous nondischargeable debt

will prevent him from obtaining the fresh start he needs and is contemplated by bankruptcy law

is answered by the Supreme Court's observation in *Cohen* that the fresh start intended has its

limits where the debtor has engaged in fraud. *Id.* at 217 (recognizing that the Bankruptcy Code has long prohibited debtors from discharging debts on account of fraud, embodying its basic policy of affording relief only to the "honest but unfortunate debtor") and 223 (concluding it unlikely that in drafting §523(a)(2) Congress would have favored the fraudulent debtor over the defrauded victims); *see also Cohen v. De La Cruz (In re Cohen),* 106 F.3d at 59 (3d Cir. 1997) ("Where a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors."); *In re Braen,* 900 F.2d 621, 625 (3d Cir. 1990) ("Although it is true that the bankruptcy laws were generally intended to give troubled debtors a chance, the nondischargeability exceptions reflect Congress' belief that debtors do not merit a fresh start to the extent that their debts fall within §523.").

Finally, the facts of this case touch on the implications raised by the hypotheticals the Supreme Court discussed in *Cohen*.  Mr. Wiley testified that the failure of the CSS Deal was the primary trigger of McGrath's death spiral, as it was left with debt to Centric it could not pay, in part because the profits it expected from the CSS Deal were never realized as a result of the Debtor fabricating the deal.  Mr. Wiley himself had to file for bankruptcy as a result, and lost his home, his business, and his livelihood.  This cascade of losses arose from the Debtor's fraud in presenting and perpetuating a concocted deal on which Mr. Wiley relied.  Applying the reasoning of the Supreme Court in *Cohen*, if the limit of nondischargeability were the value of the money fraudulently obtained by the Debtor, it would leave Mr. Wiley far short of being made whole, a result that would favor the interest of the Debtor in a fresh start over the interest Congress expressed in protecting victims of fraud by enactment of §523(a)(2)(A).  *See Cohen,* 523 U.S. at 223.

24

The Court therefore finds, pursuant to §523(a)(2)(A), that the Premium Payment under

the Note, incorporated into the Default Judgment, is nondischargeable in the amount of

$2,426,000.00.

### 4.     Mr. Wiley Failed to Establish that Any Portion of the Default Judgment is Nondischargeable Pursuant to §523(a)(4)

The Court concludes that neither the full amount of the Default Judgment nor any portion

thereof is nondischargeable pursuant to §523(a)(4).

Taking first §523(a)(4)'s exception from discharge for any debt for fraud or defalcation

while acting in a fiduciary capacity, the evidence did not establish that the Debtor served in a

fiduciary capacity with respect to McGrath or Mr. Wiley for purposes of that subsection.  As

discussed *supra*, under §523(a)(4) fiduciary capacity has a narrower meaning than it does under

common law, and requires the existence of an express or technical trust.  Such a trust does not

arise from a wrongful act, but rather the Debtor had to be a trustee before and without reference

to his fraud.  The evidence in this case was that McGrath obtained capital to be deployed by Idea

Solutions, through the Debtor, to complete the various deals Mr. Wiley and the Debtor had

obtained.  There was no evidence that the Parties intended to or did create a trust relationship

with respect to the payments McGrath made.  While Mr. Wiley asserts in the Complaint and

testified at Trial that he believes the Debtor owed him fiduciary duties as his business partner,

that is insufficient to establish that an express or technical trust existed prior to any of the 2017

Deals Outstanding Payments having been made.  As such, while the Debtor committed fraud as

discussed *supra*, the evidence does not support a finding that he did so in a fiduciary capacity as required for purposes of §523(a)(4).[22]

The evidence also does not support Mr. Wiley's claim that the Default Judgment is nondischargeable as a debt for embezzlement or larceny. The Complaint alleges that embezzlement or larceny existed because the Debtor misappropriated over $1.2 million from Mr. Wiley, then liquidated it by gambling it away. There was very limited testimony, and no documentary evidence, regarding the Debtor's gambling. While he did admit that he gambled with some of the funds received from McGrath, he further testified that he also gambled with his own money. Mr. Wiley made no effort and presented no evidence to identify or quantify how much of the money that McGrath paid to Idea Solutions was used to fund the Debtor's gambling. The only conclusion the Court can reach, based on the Debtor's own admission, is that he gambled some, but not all, of the money McGrath paid. Although Mr. Wiley has left the Court to fill this evidentiary gap with a finding that, because the Debtor gambled away some of the payments McGrath made, he is liable under §523(a)(4) for all of the payments, the Court declines to do so. Mr. Wiley had the burden of proving by a preponderance of evidence how much of the payments McGrath made to Idea Solutions was misappropriated for the Debtor's gambling, whether by embezzlement or larceny. Having failed to meet that burden, Mr. Wiley has not established that any portion of the Default Judgment is nondischargeable pursuant to §523(a)(4) as a debt incurred by embezzlement or fraud.

---

22 Because the fiduciary capacity prong is not satisfied, the Court need not discuss whether the Debtor engaged in defalcation.

**5.      Mr. Wiley's Judicial Lien on the Property Will Be Avoided to the Extent it Exceeds $115,864.95**

**a.      The Parties' Arguments in the Pleadings and at the Hearing**

Applying the formula in §522(f), the Debtor asserts in the Lien Avoidance Motion that the Property's value is $695,000, as declared in his Schedule A/B, of which the Debtor has exempted $27,900 pursuant to §522(d)(1) of the Bankruptcy Code (the "Claimed Exemption"). With respect to his valuation of the Property, the Debtor testified at Trial that he and his counsel arrived at the $695,000 value listed in his bankruptcy schedules based on online appraisals by Zillow, Reddit, and Trulia.

The Debtor asserts that Mr. Wiley's judicial lien of $3,678,122.58 is subordinate to two senior mortgage liens: (i) a first mortgage lien held by PHH Mortgage with a principal balance of $576,190.04 (the "PHH Lien"); and (ii) a second mortgage lien held by NASA Federal Credit Union in the amount of $15,239.41 (the "NASA Lien").  After subtracting the PHH Lien, the NASA Lien, and the Claimed Exemption from the Property's alleged value, the Debtor asserts that only $75,669.65 remains in equity to which Mr. Wiley's judicial lien may attach.  The Debtor therefore seeks by the Lien Avoidance Motion the reduction of Mr. Wiley's lien to that amount, and avoidance of the excess.

In his response to the Lien Avoidance Motion,[23] Mr. Wiley argued that the Property's value is $821,200.00, leaving $229,569.65 in equity to which his judicial lien may attach after accounting for the PHH Lien, NSA Lien, and Claimed Exemption.

At the Trial, the Debtor took the position for the first time that, in addition to the PHH

---

23 Bankr. Docket No. 53.

Lien and the NASA Lien, a third mortgage lien encumbers the Property based on a mortgage the

Debtor granted to American Broker Conduit in 2007 for indebtedness of $117,800 (the

"American Lien").  The Debtor asserted at Trial that he only learned of the American Mortgage

Lien in October 2023 when checking the Chester County Recorder of Deeds online portal.

According to the Debtor, an entity named Good News Trust Ltd. ("Good News Trust")

ultimately acquired by assignment the mortgage underlying the American Lien in 2013, and JP

Morgan Chase subsequently filed a mortgage satisfaction in 2014.

Accounting for the American Lien, the Debtor asserted at Trial that there actually are

three mortgage liens encumbering the Property: (i) the PHH Lien, in the amount of $576,190.94

(after the Debtor's entry into a loan modification agreement);[24] (ii) the NASA Lien, in the

amount of $15,239.41; and (iii) the American Lien, in the amount of $117,800.00.  The Debtor

therefore asserted that the three mortgage liens encumbering the Property and senior to Mr.

Wiley's judgment lien total $709,230.35.  After including he Claimed Exemption, the Debtor

argued that there is no remaining equity in the Property to which Mr. Wiley's judicial lien may

attach, and it therefore should be avoided in full pursuant to §522(f).

On cross-examination, however, the Debtor was not able to state what amount, if any,

remains due and owing with respect to the mortgage underlying the American Lien, and stated

that the mortgage was not listed in his schedules because he had only learned of it post-petition.

---

24 Mr. Wiley argued at the Hearing that the increase of the principal amount of the mortgage underlying
the PHH Lien by approximately $100,000 through a loan modification was prejudicial to Mr. Wiley as a
junior creditor, and resulted in the loss of the PHH Lien's priority with respect to that increased amount.
The Court dispensed with this argument on the record at the Hearing, relying on *Fraction v. Jacklily*,
2021 WL 4037508 (E.D. Pa. 2021) (affirming a bankruptcy court decision holding that loan modifications
that capitalized unpaid interest, escrow payments and advances, thereby increasing the principal amount
owing, did not cause the senior debt to lose its priority to junior debt because such recapitalization was

With respect to his valuation of the Property, the Debtor acknowledged that the only evidence he

had in support of that valuation was his own testimony and his testimony at the meeting of

creditors held pursuant to §341 of the Bankruptcy Code.

In support of his opposition to the Lien Avoidance Motion, Mr. Wiley presented the

testimony of Henry Hoffman ("Mr. Hoffman"), a real estate appraiser who was qualified as an

expert in real estate appraisal.  Mr. Hoffman reviewed the Property and prepared an appraisal

report, effective June 15, 2022 (the "Appraisal Report").  Based on his inspection of the exterior

of the Property,[25] what he believed were reasonable assumptions regarding the condition of the

Property, a prior sale listing of the Property, public records regarding the Property, and

comparable sales, Mr. Hoffman determined that the value of the Property as of the Debtor's

bankruptcy filing was $725,000.

Mr. Wiley also presented the testimony of Patrick Moran ("Mr. Moran"), a real estate

title searcher who was qualified as an expert in real estate title searching.  Mr. Moran conducted

a title search on the Property in February 2022, and again on the day prior to the Hearing.  He

testified that there were no differences in the two title search results, and that in both the

mortgage underlying the American Lien had been marked satisfied in 2014.  According to Mr.

Moran, the only outstanding mortgages on the Property were those underlying the PHH Lien and

the NASA Lien.  In his professional opinion and based on the public records he reviewed in

connection with his title searches, Mr. Moran testified that the American Lien was no longer an

---

not the creation of new liability).

25 Mr. Hoffman did not have access to the interior of the Property.  He testified, however, that based on
his experience, none of the online appraisal sources the Debtor used to determine his asserted value would
have conducted an interior appraisal either.

encumbrance on the Property because it had been satisfied.  On cross examination, Mr. Moran

was questioned as to how the satisfaction could have been filed by the original lender when the

mortgage had been assigned to a separate entity.  Mr. Moran testified that he had seen it done in

the past, and because the satisfaction had been accepted by the Chester County Recorder of

Deeds, he accepted the recorded satisfaction as valid.  He did not, however, see a mortgage

satisfaction from the assignee, Good News Trust, nor did he see any filing by Good News Trust

seeking to correct or withdraw the mortgage satisfaction.

### b.    The Court's §522(f) Calculation

As an initial matter, the Debtor's Schedule D reflects that the amount of the PHH Lien as

of the petition date was $565,995.64, approximately $10,000 less than the amount the Debtor

asserted in the Lien Avoidance Motion and at the Hearing.  As the Court expressed on the record

at the Hearing, the relevant figure is the amount of the lien as of the Debtor's bankruptcy filing.

As such, for purposes of the Court's §522(f) calculation, it will use for the PHH Lien the amount

set forth in the Debtor's Schedule D.

There was no dispute at the Hearing regarding the amount or validity of the NASA Lien,

and therefore the Court's §522(f) calculation will use the uncontested figure of $15,239.41.

With respect to the American Lien, the evidence showed that it was marked as satisfied in

2014.  The Court credits Mr. Moran's testimony regarding the satisfaction of the mortgage

underlying the American Lien, and did not receive any evidence that the Debtor continues to owe

any amount on the underlying debt.  Notwithstanding that lack of evidence, at the conclusion of

the Hearing the Court kept the evidentiary record open until December 8, 2023, to allow the

Debtor the opportunity to determine the outstanding balance on the debt.  The Debtor thereafter

informed the Court that no amount remains owing. As such, the Court's §522(f) calculation will not include any amount for the American Lien.

Finally, with respect to the value of the Property, the Court credits the testimony and appraisal report of Mr. Hoffman concluding that the Property's value is $725,000. The Court finds that Mr. Hoffman's methodology for making that valuation, set forth in his testimony and report and using both the Property's attributes and market indicators of value, was valid, thorough and based on his professional expertise and experience. By contrast, the Debtor's valuation of the Property of $695,000 was supported only by his testimony. The Debtor did not introduce into evidence the various online appraisals he testified were the basis of his valuation, leaving the Court unable to gauge the reasonableness of his ultimate value conclusion, notwithstanding that it is the value set forth in his Schedule A and that the United States Trustee did not challenge the Debtor's valuation at the §341 meeting of crediotrs. As such, the Court's §522(f) calculation will be based on a value of $725,000 for the Property.

Applying these figures and the Debtor's homestead exemption of $27,900.00, the Court makes its §522(f) calculation as follows:

| | |
|---|---|
| Property Value: | $725,000.00 |
| PHH Lien: | -$565,995.64 |
| NASA Lien: | -$15,239.41 |
| Claimed Exemption | -$27,900.00 |
| **Remaining Equity** | **$115,864.95** |

As such, the Court finds that there remains $115,864.95 in equity to which Mr. Wiley's judicial lien may attach (the "Judicial Lien Amount"), and that pursuant to §522(f) of the Bankruptcy Code, Mr. Wiley's judicial lien is avoided to the extent it exceeds $115,864.95.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that (i) the portion of the Default Judgment attributable to the Outstanding CSS Payments of $577,000 and the Premium Payment of $2,426,000.00, for a total of $3,003,000.00, is excepted from the Debtor's discharge pursuant to §523(a)(2)(A) of the Bankruptcy Code, but the balance of the Default Judgment, in the amount of $675,122.58, is not excepted from discharge under either §523(a)(2)(A)or §523(a)(4) of the Bankruptcy Code; and (ii) Mr. Wiley's judicial lien on the Property with respect to the Default Judgment is avoided pursuant to §522(f) of the Bankruptcy Code to the extent it exceeds the Judicial Lien Amount of $115,864.95.

An Order consistent with this Memorandum shall be issued contemporaneously herewith.

Dated:  May 10, 2024

_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE